COLLETTE *v.* COLLETTE.

1. DIVORCE — SEPARATION BY CONSENT — DESERTION — EXTREME CRUELTY.

   Where a husband and wife agreed to separate, she to live with her parents and he with his, his leaving her, if it could be said to amount to legal desertion, would not constitute such "extreme cruelty" as to warrant a divorce short of the statutory two-year period.

2. SAME—FINANCIAL CONDITION OF HUSBAND NO GROUND FOR DIVORCE.

   That defendant husband was financially unable to do as much for his wife, and furnish her as comfortable a home after marriage as her parents had, would not constitute grounds for divorce.

3. SAME—EVIDENCE—SUFFICIENCY.

   The conclusion of the court below, that plaintiff had not established her right to a divorce, *held*, justified by the record.

Appeal from Menominee; Flannigan (Richard C.), J. Submitted June 9, 1920. (Docket No. 24.) Decided September 30, 1920.

On failure to furnish support as grounds for divorce or separation, see notes in 29 L. R. A. (N. S.) 618; 43 L. R. A. (N. S.) 262.

On inability of husband to support wife as excuse for her refusal to live with him, see note in L. R. A. 1915A, 222.

Bill by Myrtle Irene Collette against William Joseph Collette for a divorce. From a decree dismissing the bill, plaintiff appeals. Affirmed.

*Doyle & Barstow*, for plaintiff.

*John J. O'Hara*, for defendant.

STEERE, J. The parties to this suit were married on December 27, 1916, in Menominee, Michigan. Plaintiff was then about 20 and defendant about 24 years of age. They separated about April 20, 1918, following an understanding, indefinite as to time, that they should live apart, she to remain with her parents in Menominee, as she desired and he did not, while he went to stay with his parents, in Marinette, Wisconsin. They never thereafter lived together or assumed the relations of husband and wife. One child was born of their marriage, a girl 16 months old when this suit was begun, on April 28, 1919.

The grounds for divorce charged in plaintiff's bill of complaint are failure to support and extreme cruelty, alleged as follows:

"V.

"And the plaintiff further shows unto the court that the said defendant disregarding the solemnity of his marriage vows has grossly and wantonly and cruelly refused and neglected to provide a suitable maintenance for this plaintiff and said child; and said defendant during all of which time being of sufficient suitable ability to provide such suitable maintenance.

"VI.

"The defendant has likewise, as plaintiff charges, been guilty of extreme cruelty to this plaintiff, and the plaintiff specifies the following facts as instances of the refusal to maintain, and cruelty herein charged, to wit:

"On the 20th of April, 1919, the defendant abandoned the plaintiff and said child and has never since said time visited either the plaintiff or said child, nor

has he at any time during such period contributed one penny to either the said plaintiff or her said child."

In his answer defendant makes denial and meets her charges as follows:

"V.

"To the fifth paragraph of the said bill of complaint the defendant says that he did not disregard the solemnity of his marriage vows or grossly or wantonly refuse to support the plaintiff and her child, and that he was ready and willing to provide support in a home for themselves, but she refused to live with him, choosing to remain with her parents instead of keeping house with him as he had urged and requested her to do.

"VI.

"In answer to paragraph six, the defendant says that he did leave her on or about the 12th day of February, 1918, because she refused to leave the home of her parents, and that he could not live peacefully or harmoniously in the home of the mother and father of the plaintiff, and that he gave her plenty of opportunities to take up her abode with him, but she steadily refused and still refuses to live apart from her mother and father, although the defendant has offered to provide the plaintiff with a suitable home in accordance with his means and earnings."

The case was heard in the circuit court of Menominee county July 22, 1919, on pleadings and proofs taken in open court, resulting in dismissal of plaintiff's bill of complaint, but with costs to plaintiff. It incidentally appears from the testimony that under some order of the court not in the record defendant had made other payments to or for his wife and child.

Three witnesses testified in the case, plaintiff, her father, and defendant. It was shown that plaintiff was the only child of her parents with whom she lived up to the time of her marriage, well provided and cared for. Her father was a business man of indicated responsibility and good standing in the city of Menominee, where he had been located for over 20

years. Defendant had worked for her father for a time before they were married. He was a common laborer, working for day wages, when and after they were married, mostly in sawmills, and when he could not get work in them in such other employment as he could obtain. Five months before their marriage he had obtained a position with a manufacturing concern in Racine, Wisconsin, called the Harvey Spring Works, and soon after they were married returned to that employment, taking his wife to Racine with him. While there they lived in furnished rooms secured at a rental of $8 per week. He worked steadily, taking his earnings home to his wife. His wages were raised from $15 to $19 per week after his return, but he gave up his position at the end of three months and went back to Menominee on her insistence, because, as she claimed, the damp climate at Racine was injurious to her health and she could not stand it. He then secured work in Menominee with a lumber company at less wages. There they rented rooms and kept house in a place on Dunlap avenue, which she testified was "pleasant enough" and she would have "thoroughly enjoyed it" if it had been their own home. Prior to the birth of their child they moved to other quarters to economize, as she said, preparatory to her going to a hospital during her confinement. Of this she testi-fied:

"I and Mr. Collette previous to the birth of the baby were saving up sufficient funds to take care of the expense at that time and he was giving me what he made and I was saving it."

When confined she was taken to a hospital where she remained 10 days and defendant visited her every evening while she was there. She was then taken with their baby to her parents' home where she desired to go and they lived together there in rooms upstairs for some time, when he began to urge her to go

from there with him and live by themselves, which he claimed would be pleasanter and better for them. This she declined to do, telling him, as he testified: "She wasn't strong enough to keep house and that I couldn't afford to hire help." This he conceded was true, but said he could help her and thought they could get along.

Previous to making their home with her parents, at which time he says "things started to go wrong," they appear to have lived together agreeably as husband and wife mutually interested in each other and their own family affairs. Her own testimony shows that he had until then deferred to her wishes as to where they should live and turned his earnings over to her. She admits of him:

"He never called me bad names. He did not stay out late at night, not so bad. He never was a drinking man. * * * When he would go out he would tell me where he was going. * * * William to some extent is an ambitious fellow and likes to get along and make good money. * * * He is a good boy that works hard and always has worked hard since we have been married. He has spoken of wanting to be a machinist several times. I discouraged him. I told him he should not do it at the baby's and my expense."

He also during the war, after they had separated, wanted to be a soldier and tried to enlist in the marines, when she again successfully "discouraged him" and caused his rejection by refusing her consent as his wife.

Defendant's anxiety to leave her parents' home with his wife and live by themselves was stimulated largely, as he claims, by his equivocal position there and treatment of him by her mother, with whom he frankly said he "could not get along," although he spoke highly of her father, saying, "He treated me all right all the way through. He is all right." Some of the causes of his desire to leave with his wife were,

as he tells them, that objections were made to his visiting his own parents and his wife insisted on their having Sunday dinner "down with the old folks," which for himself he did not desire "because she objected to go to my folks for dinner"; that her mother told him, "Myrtle shouldn't have married a poor man, that I never could make enough money for her," etc. He said he liked his wife as well as ever, but admitted the charge of lack of love and affection for their child, giving as a reason lack of opportunity, complaining that while he was there, "They wouldn't allow me to take the baby up. They told me I was awkward with it; when they wanted to name the baby they never asked me what the name was; I never knew what they were going to name it until the minister came to name it; that is the first I knew about it."

Some of his stated reasons for desiring to live elsewhere with his wife are explained or denied by her, but that it was then impressed on him that his wife had made a mistake when she married a poor man, and into his family, we do not find denied. Her father, who was the only other witness in the case, added little to the undisputed facts. He told in outline of what he had done for his daughter, of her marriage to defendant, of where they lived together, the birth of their child and of their thereafter living for a time at his home, when defendant left, and witness from that time supported his daughter and her child at his own home. But he told of no unkindness on defendant's part or domestic troubles while they were together, and in a spirit of regret rather than bitterness spoke of his limited capacity and inability to learn a skilled trade, or mechanical work, saying, in part, "He is a quick working man, but as far as any head work, he is entirely lost." It may be said that to some extent defendant's testimony seems to sustain that view, when adroitly cross-examined by skillful counsel.

The diversity of opinion between these parties as to their leaving her parents' home apparently led to some estrangement, but finally ended, as both testify, in an understanding that she would remain with her parents and he would go and make his home with his folks. He left her parents' home April 20, 1918, and called there shortly after to see her but did not find her at home. He testified that he then intended to support his wife and child, but soon thereafter received a letter from her "telling me I could go where I wanted to and she could stay with her folks. Her dad was willing to take care of her," and he then went away, going to Clintonville, Wisconsin. This letter was identified, introduced in evidence and marked "Exhibit 1" but is not printed in the record, having been mislaid by his attorney, as we are advised. That such letter was written by her and before the trial court is not disputed. This court is only advised of its contents in a fragmentary way as the same crops out in direct · or cross-examination of the parties. Asked about her statement in it that she "couldn't think of living up there as long as he carried such an ungrateful feeling in his heart for your mother," she replied, "He was ungrateful to her for the hard work she did." Extracts evidently read to her from the letter, which she said she wrote on April 22, 1918, are: "I was over to Ed Channing's when you called yesterday * * * and I am going to store my belongings in my parents' attic today * * * now you have your earnings all for your own use." Mention was also made in the letter of a liberty bond which he left for her at her parents' home and she returned. It appears from her testimony that soon after they began living apart he came over from Marinette one stormy Sunday to give this bond to her, and she not being at home he left it in their mail box for her. She

211—Mich.—36.

states he obtained it from his father to be used with one she had to meet the expense of an operation which it was thought she might have to undergo, and not needing it for that purpose she returned it. What she said about it in the letter is not shown. It does appear that his first and fairly prompt but unsuccessful attempt to see his wife after they separated was followed by her returning his contribution to her support and writing him a letter of the tenor disclosed. It was upon receipt of this letter and return of his contribution that his alleged wanton and extreme cruelty in failure to support began and he left that part of the country for Clintonville, where he found work for a time and then tried to enlist. Up to that time he was not entirely forgetful of his family ties, for he sent his wife, or her father, over $30, but after she headed off his attempt to enter the military service he apparently made no further effort in that direction or to communicate with her until this suit brought after he drifted back into that jurisdiction.

Counsel for plaintiff contend that such desertion by defendant of his wife and child, "without provocation, justification or even extenuating conditions, but gratifying the caprice of his own arbitrary will," in itself "constitutes a species of cruelty," to which is added as a further ground of divorce that he has since "neglected and refused to support his wife and child or either of them."

If defendant's leaving his wife by mutual consent at the home of her parents under the circumstances shown could in any legal sense be said to constitute desertion, it, as such, would furnish no ground for divorce until after the expiration of two years; neither could it as a matter of law constitute any such "extreme cruelty" as to afford a short cut to divorce in avoidance of the prescribed statutory period for desertion.

Defendant's contention in his pleadings and testimony is that he has always been ready and willing to live with and support his wife and child to the best of his ability in such home of their own as he was able to provide, and offers to do so according to his means and earnings. He admits that she was a faithful wife, except in respect to refusing to live with him "and choosing her parents." He testified that he liked her as well as he ever did and said if she would leave her parents' home and go with him, "I am willing to do anything for her." He appears to have done all he could for her during the ordeal of her confinement, for which they prepared and broke up their home that she might have the benefit of hospital care and service. That he was unable to do as much for her, and furnish her as comfortable a home thereafter and before, as her parents could and did is quite apparent. He was but a working man with limited earning capacity when he married her and at the time of the trial. She admitted she knew when they were married that he was a poor man working for a living, without "any money to fall back on," who could only earn with his hands, and said while they lived together she "never had any complaint about his not working steadily and turning his money over to me." The cruelty of his conduct in the particulars charged is stressed in that connection by her counsel as causing their matrimonial relations to become "intolerable to her," since he well knew before he married her that she had always "enjoyed a happy home with her parents under refined and refining conditions," and this he apparently was not allowed to forget when at her parents' home with her. But such suggested distinctions in refinement and financial resources, capacity to provide, or rank in life, lie outside the provided causes for divorce. As this court, speaking through Justice BROOKE, said in *Carson* v. *Carson,* 173 Mich. 452:

"Neither misfortune nor incompetence resulting in failure to support affords the wife any grounds for relief under the law. The possibility of such a result was one of the hazards complainant undertook when she assumed the burdens incident to the contract."

In foot notes to this case as reported in 43 L. R. A. (N. S.) 255, it is said:

"It is practically unanimous opinion of the authorities that a mere failure to support is not of itself a substantive ground of divorce, and in construing statutes making 'gross, wanton, or cruel neglect' of duty, or to provide a suitable maintenance, a ground for divorce, the weight of opinion is to the same effect as Carson v. Carson, that, unless there is some circumstance of aggravation, mere failure to support is not within the meaning of the statute."

In the early case of Randall v. Randall, 37 Mich. 563, it was said, by Chief Justice COOLEY, of the husband's duty to support his wife:

"But this obligation was to support her in his family and not elsewhere; and co-extensive with it was her obligation to render family services. An obligation on his part to support her elsewhere could only arise by his turning her out of doors, or by his being guilty of such misconduct as would justify her in leaving him."

Defendant had provided for his wife in a home by themselves apparently to the best of his ability up to the time they disagreed about leaving her parents' home to live together as before. Then in contravention to his wishes she elected her own place of residence, advising him by letter, after they had agreed to live apart and he tried to see her again, that her father was willing to take care of her, she would stay with her own parents and he could go where he wanted to, as he states and as is not denied in this record.

The trial judge had the benefit of reading that letter, and of seeing and interrogating the parties, which

this court does not have. He did not find plaintiff had established her right to a divorce under the allegations in her bill and dismissed the same, but without prejudice. We find no occasion upon the record before us to disturb that result and the decree will stand affirmed, without costs to either party.

MOORE, C. J., and BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.